UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION

OGEECHEE-CANOOCHEE
RIVERKEEPER, INC.,

Plaintiff,

v.                608CV064

T.C. LOGGING, INC., HENRY THOMAS
CLARK, LOW COUNTRY LAND
CLEARING, LLC, LOW COUNTRY LAND
AND EXCAVATING, INC., RSM
ENVIRONMENTAL LAND CLEARING,
INC., and NICHOLAS R. PERKINS,

Defendants.

ORDER

I. INTRODUCTION

In this case, plaintiff Ogeechee-Canoochee Riverkeeper ("OCRK") claims that defendants T.C. Logging, Inc., Henry Thomas Clark, Low Country Land Clearing, LLC, Low Country Land and Excavating, Inc., RSM Environmental Land Clearing, Inc., and Nicholas R. Perkins violated the Clean Water Act ("CWA"), 33 U.S.C. §§ 1311(a) & 1344, by discharging dredged and fill material into waters of the United States without a permit. Doc. # 36. OCRK has moved for summary judgment on the issue of liability and standing. Doc. ## 46, 56. Defendants T.C. Logging and Clark have moved to dismiss the case for lack of subject matter jurisdiction, claiming that OCRK's injuries are not redressable by this Court and that the case has become moot. Doc. # 54.

II. BACKGROUND

The facts of this case center around the construction of a road by T.C. Logging, its owner Henry Clark (collectively "T.C. Logging"), and subcontractors Low Country Land Clearing, LLC, Low Country Land and Excavating, Inc., RSM Environmental Land Clearing, Inc., and/or Nicholas R. Perkins (collectively "subcontractors").[1] The road was built on property formerly owned by T.C. Logging on the Ogeechee River in Bulloch County, Georgia (the "Property"). Doc. # 46 at 1-2. OCRK alleges that the road construction resulted in unlawful dredging and filling of wetlands in violation of CWA Sections 301 and 404. OCRK brings this suit pursuant to 33 U.S.C. § 1365 which allows citizens to sue for CWA violations after giving notice of the alleged violation to federal and state authorities and the violator.

A. The Clean Water Act

To put the facts of this case in context, one must understand certain provisions of the Clean Water Act. Congress passed the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve this goal, Section 301 of the CWA prohibits "the discharge of any pollutant" into navigable waters of the United States without a federal permit. 33 U.S.C. § 1311(a). "Pollutants" include dredged spoil, rock, and sand, among other materials. 33 U.S.C. § 1362(6). "Navigable waters" can include wetlands if they have a "significant nexus" to traditionally navigable waters. *See U.S. v. Robison*, 505 F.3d 1208, 1222 (11th Cir. 2007) (construing *Rapanos v. U.S.*, 547 U.S. 715 (2006)). Anyone who seeks to discharge dredge or fill material into navigable waters must obtain a "Section 404" permit from the U.S. Army Corps of Engineers (the "Corps"). 33 U.S.C. § 1344(d & e). However, there are limited

---

[1] The subcontractors have not appeared in this action and there is no record of a waiver or return of service on the docket. As far as the Court can tell, these parties have not been served.

1

exemptions from this permitting requirement including discharges related to "normal farming, silviculture, and ranching activities"[2] and to the construction of certain "forest roads." *See* 33 U.S.C. § 1344(f)(1)(A), (E). These exceptions are narrowly construed and applied. *U.S. v. Huebner*, 752 F.2d 1235, 1240-41 (7th Cir. 1985).

For the "silviculture exemption" to apply, "the activities ... must be part of an established (i.e., on-going) farming, silviculture, or ranching operation...." 33 C.F.R. § 323.4(a)(1)(ii). Such activities include "plowing, seeding, cultivating, minor drainage, and harvesting for the production of food, fiber, and forest products...." 33 C.F.R. § 323.4(a)(1)(i). However, "[h]arvesting ... does not include the construction of farm, forest, or ranch roads." 33 C.F.R. § 323.4(a)(1)(iii)(B).

For the "forest road exemption" to apply, the road must be for "forestry activities," 33 C.F.R. § 323.4(a)(6)(i), and must be primarily constructed for forest functions such as "planting, fire control, or similar silviculture support activities." *See* Corps Regulatory Guidance Letter (RGL) 86-03, available at http://www.saw.usace.army.mil/wetlands/Library/rgl.htm (last visited 7/24/09).[3] Furthermore, the forest road "must be part of an ongoing silviculture, farming or ranching operation, which will not bring new areas into use, and which will comply with best management practices of 33 CFR 323.4(a)(6)." *Id.*; *see also U.S. v. Brace*, 41 F.3d 117, 129 (3d Cir. 1994) (finding certain activities were not normal agriculture and thus not entitled to the exemption since they had not been effectively on-going).

As part of its authority to administer Section 404 of the CWA, the Corps renders determinations regarding whether a given activity in wetlands requires a permit or qualifies for a Section 404(f)(1) silviculture or forest road exemption. *See* 33 U.S.C. § 1344(f)(1)(A), (E).

**B. Factual Background**

T.C. Logging bought the Ogeechee River Property in July 2006. Doc. # 46-6 at 3. The previous owner had clear-cut the Property in 2002, using an existing road on the neighboring tract to remove the harvested timber. *Id.* Since the clear-cutting, the timber was "regenerating naturally without any planting." *Id.* Sometime between late April 2007 and September 2007, Clay Stockwell, an employee of T.C. Logging with the authority to act for the company, listed the Property for sale. Doc. ## 46-9 at 9 ¶ 32; 46-3 at 12 ¶ 5. The advertisement listing the Property for sale read as follows:

> UNDER CONTRACT: 37.66 acres in Bulloch County. Located on Old River Road just beyond River View Road. Paved road frontage and over 900ft of frontage on the Ogeechee River. This tract would be great for a home site on the river or summer getaway.

Doc. # 46-6- at 4.

T.C. Logging admits that "on or before September 11, 2007, T.C. Logging and/or those who performed worked [sic] for T.C. Logging began placing fill material in wetlands on the property for the purpose of constructing a road." Doc. # 46-3 at 5 ¶ 6

---

[2] Silviculture is "[t]he scientific practice of establishing, tending, and reproducing forest stands with desired characteristics." *See* Glossary of Forestry Terms, Georgia Forestry Commission, http://www.gfc.state.ga.us/Resources/Publications/Educational/glossary.pdf (last visited 7/24/09).

[3] While RGL 86-03 was set to expire on 12/31/88, it remains in effect pursuant to RGL 05-06, available at http://www.saw.usace.army.mil/wetlands/Library/RGL/rgl05-06.pdf (last visited 7/24/09).

2

(response to request for admission). The road extends 0.69 miles in bottomland hardwood wetlands and ends at the Ogeechee River. Doc. # 46-6 at 4. It was constructed by borrowing fill material from an upland portion of the Property. *Id.* T.C. Logging also constructed roadside ditches in wetlands by excavating material from the sides of the road and dumping this material into wetlands on the north side of the road. *Id.* Prior to commencement of the road construction, T.C. Logging did not consult with the Corps about whether the road construction was exempt from CWA permitting requirements. *Id.*

After receiving complaints about the road construction, Willard Fell, a Georgia Forestry Commission official, visited the Property on September 10, 2007. Doc. # 46-9 at 10 ¶ 35. Mr. Fell saw "for sale" signs at the Property and concluded that the road was not forestry-related. Doc. # 46-12 at 2. The Corps first learned of the road construction on or around September 11, 2007 from an email sent by a Georgia Forestry Commission official. Doc. # 46-6 at 4.

On September 13, 2007, Billy Nelson of the Georgia Forestry Commission met with T.C. Logging to discuss the road. *See* doc. # 46-12. After that meeting, Nelson wrote a follow-up letter to Clay Stockwell of T.C. Logging. *Id.* According to that letter, T.C. Logging represented to Nelson that it "had decided to keep this property" and "start actively managing" it, and needed the road for "better access for forest management" and "to harvest a small area on a ridge near the river and outside the S[treamside] M[anagement] Z[one]...." *Id.*

On October 9, 2007 Carl and Lori Proman made an offer to purchase the Property. Doc. # 46-13. On October 10, 2007, unaware of the Promans' purchase offer, the Corps requested that T.C. Logging provide information regarding the road construction. Doc. # 46-6 at 4. A few days later, the Corps sent a letter to T.C. Logging which warned of the possibility and repercussions of a CWA violation and requested additional information regarding the road. Doc. # 46-14.

By October 15, 2007, T.C. Logging had entered into a contract to sell the Property to the Promans. Doc. # 41 at 10 ¶ 42. On the very next day, T.C. Logging informed the Corps that the work on the road was being conducted in accordance with ongoing forestry activities, that T.C. Logging was in the process of ensuring that the road complied with forestry best management practices, and that a "Forest Stewardship Plan" (a document that would explain how the Property was going to be managed) was being developed for the Property. Doc. # 46-6 at 4-5. T.C. Logging did not inform the Corps that it had entered into a contract to sell the property to the Promans during this conversation. Doc. # 46-3 at 7 ¶ 13.

On November 26, 2007, T.C. Logging closed on its sale of the Property to the Promans, who state that they bought the property "primarily for residential and recreational use." Doc. # 46-15 at 4; doc. #49-2 at 57. On December 5, 2007 defendant Henry Clark provided the Corps with a copy of the Forest Stewardship Plan for the Property. Doc. # 46-6 at 5. Again, T.C. Logging did not disclose to the Corps that the property had been sold to the Promans. Doc. # 46-3 at 7 ¶ 13. The Forest Stewardship Plan explained that the "primary objective of the landowner is to manage [the Property] for wildlife habitat such as for deer, quail, and turkey" and that "[t]he secondary objective is to manage the property for periodic timber income." Doc. # 46-16 at 4. The Plan stated that the road was needed because "there was no other access to the property besides the access from the river." *Id.* at 14. It also noted that

3

the road "will now allow the landowner to access his property for viewing wildlife, timber harvesting, recreational activities such as hunting and fishing, and can also be beneficial for wildlife...." *Id.* On December 12, 2007, the Corps concluded that the road had been constructed as part of normal ongoing silviculture and thus would not be subject to regulation under Section 404 of the CWA. Doc. # 46-6 at 5.

In February of 2008, the Promans applied for a building permit. This prompted a letter from OCRK to the Promans expressing concern about the use of the Property. In response to that letter, the Promans invited the Corps to visit the Property. The Corps met with Stuart Sligh of Sligh Environmental Consulting on the Property on April 9, 2008 to discuss potential CWA violations. Doc. # 49-2 at 57. At this time, the Corps was aware that the Property had been sold and that the Promans had taken out a building permit. Relying on its prior December 2007 determination and its understanding that "the existing silviculture road will continue to be used for ... future timber management and harvesting," the Corps confirmed that the road was not subject to regulation under Section 404 of the CWA. *Id.* at 64.

OCRK filed the present action challenging the Corps' decision as arbitrary, capricious, and an abuse of discretion in violation of the Administrative Procedure Act, 5 U.S.C. §§ 701-706. Additionally, it filed suit against the current defendants as well as the Promans for CWA violations. Shortly after OCRK's complaint was filed, the Corps requested, and the Court granted, a stay of this litigation so that the Corps could "reconsider the Determination and prepare a new decision" based on a fuller investigation of the facts. Doc. ## 23, 28.

The Corps issued its decision on reconsideration on October 30, 2008. Doc. # 30. It concluded that "the subject road was not constructed as part of normal, ongoing silvicultural operations or for the purpose of construction or maintenance of a forest road and is therefore not exempt from the requirements of Section 404 of the Clean Water Act." Doc. # 46-6 at 8. The Corps' revised determination was based on its findings that (1) the wetland area of the property was "regenerating naturally" and "[t]herefore the 0.69 mile long road constructed in this wetland area would not be necessary for replanting"; (2) "[t]he next opportunity to harvest merchantable timber from this wetland area would not occur for at least 20 to 25 years, or longer" and thus "there is not a need for this road associated with timber harvesting in the immediate future"; and (3) "[a]t no time between its construction and the sale of the Property was the road constructed in the wetlands used as a forest road within the meaning of [the forest road exemption]" because the road did not support silvicultural activities such as "plowing, seeding, cultivating, minor drainage, [or] harvesting for the production of food, fiber, and forest products." *See id.* at 7.

The Corps further noted:

> Had the Corps known that the property was listed for sale at the time T.C. Logging asked for the exemption determination, had the Corps known that the property had already been sold at the time the information submitted by T.C. Logging was under review, and had the Corps known that the property was being sold to owners whose primary intended use was not silvicultural in nature, the Corps would not have issued a silviculture determination based on the representations of an entity who did not own the land.

*Id.* at 6. As a result of the Corps' revised determination, OCRK voluntarily dismissed its claims against the Corps. Doc. # 31.

Additionally, OCRK has entered into a consent decree with the Promans and has dismissed its claims against them. Doc. # 33. As part of that agreement, OCRK agreed not to seek the removal of the road or the discontinuation of its use. *Id.* at 5. The Promans, in turn, agreed to "provide reasonable and ongoing access to their property" for the purpose of allowing "such remedial actions as are appropriate to improve and stabilize the road and remediate other related conditions." *Id.*

Defendants have not challenged the Corps' reconsideration order. Rather, they claim to be "actively working with the Corps to complete an application for an after-the-fact permit." Doc. # 56 at 3. T.C. Logging alleges that it has submitted a forty acre tract of land for conservation as a condition of the permit. *Id.* If issued, the permit will be in the Promans' name and defendants state that they will not have any rights under the permit. *Id.* at 7-8.

### III. STANDARD OF REVIEW

Summary judgment is proper where the record, taken as a whole, establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." F.R.Civ.P. 56(c). "An issue of fact is 'material' if it might affect the outcome of the case under the governing law.... It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the non-moving party." *Baker v. Sears, Roebuck & Co.*, 903 F.2d 1515, 1518 (11th Cir. 1990) (citations omitted). The Court must consider all the evidence in the light most favorable to the nonmoving party. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

T.C. Logging asserts its standing and mootness arguments in a motion to dismiss for lack of subject matter jurisdiction pursuant to F.R.Civ.P. 12(b)(1). Doc. # 56 at 1. The standard of review that this Court applies to such a motion depends on whether T.C. Logging is making a "factual attack" or a "facial attack" on this court's jurisdiction. *See Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990) (distinguishing "factual" attacks on subject matter jurisdiction from "facial" attacks and explaining the standard of review that applies to each). Here, T.C. Logging makes a "factual" attack on jurisdiction as it relies on extrinsic evidence and goes beyond the pleadings. *See id.* When a factual attack on standing is made at the summary judgment stage, the court applies Rule 56 summary judgment standards and is "obliged to consider not only the pleadings, but to examine the record as a whole to determine whether [it is] empowered to adjudicate the matter at hand." *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1242 (11th Cir. 2003).

### IV. ANALYSIS

#### A. Justiciability

Before addressing the merits of OCRK's claims, the Court must examine whether the claims are justiciable. Thus, it turns to the defendants' contentions that OCRK lacks standing to bring this claim and that events following the commencement of this litigation have rendered OCRK's claims moot.

In *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992), the Supreme Court set forth the test for Article III standing. First, the plaintiff must have suffered an "injury in fact," or "an invasion of a legally protected interest which is ... concrete and particularized." *Id.* at 560. Second, the injury must be fairly "traceable" to the challenged action of the defendant. *Id.*

Third, the plaintiff must establish that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561 (quotations omitted). Additionally, for an organization like OCRK to have standing to sue, it must demonstrate that: (1) its members would otherwise have standing to sue in their own right; (2) the interests at stake are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).

Turning first to whether OCRK has standing to sue on behalf of its members, the Court notes that the second and third prongs of *Laidlaw*'s organizational standing test are satisfied. The interests at stake in this case – remediation and deterrence of point source pollution in the Ogeechee wetlands – are germane to OCRK's mission "to protect the waters and wetlands of the entire Ogeechee watershed." Doc. # 54-2 ¶ 31. And because OCRK seeks civil penalties and injunctive relief in the form of mitigation and remediation, the participation of individual members in the lawsuit is not necessary to relief. *See United Food & Commer. Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 546 (1996) ("individual participation is not normally necessary when an association seeks prospective or injunctive relief for its members" as opposed to when it bases an action solely on "damages to [its] members") (quotes and cite omitted). Thus, OCRK has standing to sue so long as it satisfies the first prong, by showing that its members would have standing to sue in their own right.

It is well established that "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Laidlaw*, 528 U.S. at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)). Furthermore, pollution to bodies of water that plaintiffs use and whose integrity the CWA is intended to protect is the type of injury that courts have recognized as an "injury in fact." *Fla. Pub. Interest Research Group Citizen Lobby, Inc. v. E.P.A.*, 386 F.3d 1070, 1085 (11th Cir. 2004). The degree of injury that must be shown to establish standing is not high – an "identifiable trifle" of an injury is sufficient. *U.S. v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973) (quotations omitted); *Save Our Cmty. v. U.S. E.P.A.*, 971 F.2d 1155, 1161 (5th Cir. 1992) (noting "low threshold" for sufficiency of injury and citing cases).

OCRK has submitted affidavits from several of its members as evidence of injury. Gary Frost, an OCRK member who owns land near the Property, attests that the road acts as a dam and causes flooding on his property. Doc. # 54-4 at ¶ 10. Additionally, his "enjoyment of the swimming, fishing and boating experience is negatively affected by [his] knowledge of the unpermitted dredging and filling of wetlands, the disruption of the natural flow of the surrounding waters, and the increased dirt entering the river." *Id.* at ¶ 8. Chandra Brown, Executive Director and member of OCRK, attests that she has recreated in the Ogeechee River for over 20 years and complains that the road on the Property has changed the hydrology of the area, affected the fish and wildlife habitat, and introduced more sediment to the river which has diminished its beauty. Doc. # 54-3 at ¶ 9. Dianna Wedincamp is the Watershed Specialist for OCRK as well as a member. Doc. # 54-5 at ¶ 2. She leads canoe excursions down the Ogeechee River and attests that the wetland fill has changed the natural hydrology, destroyed wildlife

habitat, and changed the aesthetics along the river which affects her canoe excursions. *Id.* at ¶ 7. These affiants, all members of OCRK, have attested to an injury to their economic and aesthetic interests, which is sufficient to establish an injury in fact.

The alleged injury is fairly traceable to the conduct of the defendants, as T.C. Logging has admitted to dumping fill material into the wetlands that drain into the Ogeechee. The types of injuries alleged are consistent with the injuries that one might expect to result from the filling of wetlands. *See* 40 C.F.R. § 230.41(b) (describing the harmful effects of discharging dredged or fill material into wetlands, including damage to habitat, flooding, and degradation of water quality and noting that "apparently minor loss of wetland acreage may result in major losses through secondary impacts").

T.C. Logging has not challenged the injury in fact or traceability prongs of standing, but rather focuses its challenge on redressability. First, it argues that OCRK's claims against it are not redressable because T.C. Logging no longer owns the property. Thus, it claims, "Arguably, even assuming an injunction were to be granted in favor of [OCRK], said injunction would have no effect on T.C. Logging as a predecessor in interest." Doc. # 49 at 8 n.1. But "the fact that [defendants] do not have property rights in [a] [s]ite does not preclude [a] court from issuing injunctive relief against them or any defendant to ensure compliance with environmental statutes." *U.S. v. Costello*, 2006 WL 3781708, at *4 (D. Md. 12/20/06). That is particularly true in this case, where the current property owners entered into a consent decree allowing access to their property for environmental remediation. *See* doc. # 33 at 5. Nothing stands in the way of a court order requiring remediation on the Property despite the change in ownership.

T.C. Logging also argues that events subsequent to the filing of this lawsuit have affected redressability thereby rendering this case moot. "[A] federal court has no authority 'to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'" *U.S. v. Fla. Azalea Specialists*, 19 F.3d 620, 622 (11th Cir. 1994) (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895)). Thus, "if an event occurs while a case is pending ... that makes it impossible for the court to grant any effectual relief whatever to a prevailing party, the [case] must be dismissed." *Church of Scientology of Cal. v. U.S.*, 506 U.S. 9, 12 (1992) (quotes and cite omitted). A defendant has a heavy burden in seeking to have a case dismissed as moot and "must demonstrate that it is *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 66 (1987) (quotes and cite omitted, emphasis in original).

T.C. Logging argues that the case has become moot for several reasons. First, because OCRK has settled with the Promans on terms that allow the forest road to remain in place on the Property, "the ongoing CWA violation [cannot] be remedied and any alleged harm [will] be allowed to continue." Doc. # 49 at 7. Thus, T.C. Logging argues that OCRK's claims are not redressable and have become moot in light of the settlement. This argument fails. OCRK's prayer for relief asks for injunctive relief "to compel defendants to restore the affected wetlands by undertaking any remedial measures necessary to stabilize the road, otherwise remedy the damage to the wetlands and surrounding waters, and prevent harm to wetlands and surrounding waters." Doc. # 36-2 at 20. OCRK does not seek removal of the road because it has concluded that

7

removal would do more environmental harm than good. OCRK's agreement with the Promans that it will not seek removal of the road does not affect the ability of the Court to provide the remedies of remediation and mitigation that OCRK seeks in its complaint.

Nor can T.C. Logging properly claim that the case is moot because there is no expectation that the alleged violation will recur. First, the alleged violation continues as long as the fill remains in the wetland. *See Sasser v. E.P.A.*, 990 F.2d 127, 129 (4th Cir. 1993). Thus, the violation will undoubtedly recur since the violation is continuing in nature. Second, a case only becomes moot when "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Altamaha Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 309 F. App'x 355, 359 (11th Cir. 2009) (quotes and cite omitted). Here, the effects of the initial violation remain. As the violation has yet to be remedied, the case is not moot.

Additionally, T.C. Logging claims that the case is moot because the Corps is presently considering an "after-the-fact" permit application. "Federal regulations allow a party who conducted unauthorized activities without a permit to apply for an after-the-fact permit to legitimize the party's actions." *Jones v. Thorne*, 1999 WL 672222, at *11 (D. Or. 8/28/99). The relevant regulation provides, "Following the completion of any required initial corrective measures, the [Corps'] district engineer will accept an after-the-fact permit application unless he determines that one of the exceptions listed [in the regulation] is applicable." 33 C.F.R. § 326.3(e)(1). The legal effect of an after-the-fact permit on defendants' liability is questionable. T.C. Logging asserts that any after-the-fact permit would be issued to the current property owners – the Promans – and that the defendants will not have "any rights" under the after-the-fact permit. Doc. # 56 at 7-8. T.C. Logging has provided no testimony from the Corps as to what the terms of the permit would be and whether it will in fact be issued. Thus, T.C. Logging simply asks the Court to rely on its representations that a permit is in the works, that it will in fact be issued, and that it will resolve all liability. At this point, whether an after-the-fact permit will be issued and its effect on defendants' liability is nothing more than speculation.

Additionally, there is the issue of whether the Corps can award an after-the-fact permit that would resolve the litigation that is currently pending and under the jurisdiction of a federal court. The regulation prohibits acceptance of an after-the-fact permit application when "the district engineer is aware of enforcement litigation that has been initiated by other Federal, state, or local regulatory agencies, unless he determines that concurrent processing of an after-the-fact permit application is clearly appropriate." 33 C.F.R. § 326.3(e)(1)(iv). However, this regulatory provision provides no express guidance when an enforcement action has been initiated as a 33 U.S.C. § 1365 citizen suit and there is little case law addressing the effect of an after-the-fact permit on pending litigation. Should an after-the-fact permit eventually issue, the Court will consider the effect of such a permit on this litigation with the benefit of briefing from the parties and the Corps (through an amicus brief).[4] Suffice it to say

---

[4] Understandably, the defendants may be reluctant to proceed with any remediation or mitigation efforts that are a condition of an after-the-fact permit without some confidence that the permit will resolve their liability. If that is the case, then the defendants could move the Court for a declaratory judgment on the effect of the after-the-fact permit once their negotiations with the Corps are sufficiently complete. Alternatively, the defendants could raise the issue of an after-the-fact permit during the damages/penalties

8

that, at this point in time, the Court is not precluded from granting relief and the case is not moot.

The Court concludes that there is a live justiciable controversy for which it is able to provide redress for the plaintiffs' injuries. Standing is satisfied, the case is not moot, and OCRK has standing to sue on behalf of its members.

### B. Liability

The Court turns to whether there is a genuine issue of material fact as to whether defendants violated the CWA. Section 301 of the CWA prohibits "the discharge of any pollutant" into "the navigable waters of the United States" except in accordance with permits issued under, *inter alia*, § 404 of the CWA. 33 U.S.C. § 1311(a). To establish a prima facie case of a violation of Sections 301 and 404, OCRK must prove that defendants are (1) persons who (2) discharged a pollutant (3) from a point source (4) into waters of the United States (5) without a permit issued under CWA section 404. *See* 33 U.S.C. §§ 1311(a), 1344 and 1362 (definitions); *see also U.S. v. RGM Corp.*, 222 F. Supp. 2d 780, 786 (E.D. Va. 2002).

First, the term "person" includes both the party who performs the work that resulted in a CWA discharge as well as those who had responsibility or control over that work. *U.S. v. Board of Trustees of Fla. Keys Cmty. Coll.*, 531 F. Supp. 267, 274 (S.D. Fla. 1981). Also, a corporation is a "person" under the CWA. 33 U.S.C. § 1362(5). It is undisputed that defendants are "persons" under the CWA.

Likewise, it is undisputed that defendants discharged a pollutant ( in the form of dredged or fill material) from a point source into waters of the United States. "Fill material" is defined as "material placed in waters of the United States where the material has the effect of: (i) Replacing any portion of a water of the United States with dry land; or (ii) Changing the bottom elevation of any portion of a water of the United States." 33 C.F.R. § 323.2(e)(1). Fill material is a pollutant under the CWA. *See U.S. v. Weisman*, 489 F. Supp. 1331, 1337 (M.D. Fla. 1980); *U.S. v. Robinson*, 570 F. Supp. 1157, 1163 (M.D. Fla. 1983). The term "discharge of fill material" means the "addition of fill material into waters of the United States" and includes "road fills." 33 C.F.R. § 323.2(f). Furthermore, the construction undoubtedly involved bulldozers and dump trucks which are point sources under the CWA. *See Weisman*, 489 F. at 1337 (bulldozers and dump trucks are point sources). Thus, the construction of the road using fill material was a discharge of a pollutant from a point source.

The term "waters of the United States" means "[a]ll waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce" and "wetlands adjacent to [these] waters." *See* 33 C.F.R. 328.3(a). As previously mentioned, the wetlands must have a "significant nexus" to traditionally navigable waters to be considered waters of the United States. *Robison*, 505 F.3d at 1222. T.C. Logging has never argued that the wetlands in which the road was built are not waters covered by the CWA. T.C. Logging's previous position that the road fell within the forest road or silviculture exemptions to the CWA evinces its belief that the wetlands were waters of the United States covered by the CWA. Additionally,

---

phase of this litigation and request that the Court defer to the Corp's determination of the appropriate remedy. Finally, the EPA Administrator or the Corps could intervene in this suit to assert its interest in resolving defendants' liability with an after-the-fact permit. *See* 33 U.S.C. § 1365(c) (granting Administrator right to intervene in citizen suits).

T.C. Logging does not challenge the Corps' revised determination that the construction of the road involved a discharge of dredge or fill material in violation of the CWA. To accept the Corps' conclusion, one must accept the fact that the wetlands in which the road was built were waters of the United States.

Thus, there is no dispute that the road was built in waters of the United States. Nor is there any question that the discharge occurred without a CWA permit.

Defendant T.C. Logging has essentially admitted that OCRK has established a prima facie case against them. In response to Plaintiff's Requests for Admissions, T.C. Logging admits that "fill material was discharged" into wetlands as part of road construction activities. *See* Ex. A, Resp. to Req. for Admissions Nos. 20, 21. More specifically, T.C. Logging admits that "on or before September 11, 2007, T.C. Logging and/or those who performed work[] for T.C. Logging began placing fill material in wetlands on the property for the purpose of constructing a road." *See id.* at No. 6. Thus, the Court finds that absent an exemption from CWA's § 404 permitting requirements, there is no question that defendants T.C. Logging and its president Henry Thomas Clark are liable for violating the CWA.[5]

While T.C. Logging previously claimed to be exempt from the CWA's permitting requirements under the Section 404(f)(1)'s silviculture or forest road exemptions, it now concedes that neither exemption applies to the construction of the road. T.C. Logging bears the burden of proving entitlement to either of these exemptions. *See U.S. v. Brace*, 41 F.3d 117, 124 (3d Cir. 1994). The silviculture exemption exempts discharge of fill material for "normal"

---

[5] The Court refrains from ruling on the liability of the subcontractors until it is clear that they were properly served and are under the jurisdiction of the Court.

silviculture activities "such as plowing, seeding, cultivating, minor drainage, harvesting for the production of food, fiber, and forest products...." 33 U.S.C. § 1344(f)(1)(A). The only activity that defendants might claim under this exemption would be the harvesting of timber. However, roads constructed for harvesting timber are not covered. 33 C.F.R. § 323.4(a)(1)(iii)(B) ("Harvesting ... does not include the construction of farm, forest, or ranch roads.") Thus, T.C. Logging has not refuted OCRK and the Corps' position that the silviculture exemption does not apply to the construction of the road.

Additionally, T.C. Logging has abandoned its previous position that the road construction was subject to the forest road exemption. The forest road exemption covers the discharge of dredged or fill material "for the purpose of construction or maintenance of farm roads or forest roads ... where such roads are constructed and maintained in accordance with best management practices...." *See* 33 U.S.C. § 1344(f)(1)(E). Permanent roads constructed under the forest road exemption must be done for "forestry activities," *see* 33 C.F.R. § 323.4(a)(6)(i), and "intended to be used solely for such forest functions" as "planting, fire control, or similar silviculture support activities." *See* Corps RGL 86-03, available at http://www.saw.usace.army.mil/wetlands/Library/RGL/RGL86-03.pdf (last visited 7/21/09) (noting, as an example, that if a road through a national forest would principally serve tourists visiting a recreational site in the forest, not the actual business of silviculture, it would not be a forest road). Furthermore, "the forest or farm road must be part of an ongoing silviculture, farming or ranching operation, which will not bring new areas into use...." *Id.*

The defendants began construction of the road before or around the time at which T.C. Logging listed the Property for sale. While the timber had been harvested years earlier, it was regenerating naturally. The Corps concluded that the next harvesting opportunity would not occur for at least 20 to 25 years. Additionally, T.C. Logging's Forest Stewardship Plan stated that the primary objective for the property was to manage a wildlife habitat. The road was described in that document as an "access road on the property" that was "needed because there was no other access to the property besides access from the river." Doc. # 46-16 at 14. All of these facts lead to the conclusion that the road was not built to support an ongoing silviculture operation and it was not intended to be used solely for silviculture support activities.

Finally, the Corps has concluded on reconsideration that "the subject road was not constructed as part of normal, ongoing silviculture operations or for the purpose of construction or maintenance of a forest road, and [it] is therefore not exempt from the requirements of Section 404 of the CWA." Doc. # 46-6 at 8. T.C. Logging's position is that it "ha[s] not disputed the [Corps'] conclusion on reconsideration ... and ha[s] agreed to apply for an 'After the Fact' permit as allowed under the Clean Water Act." Doc. # 46-4 at 6-7. Thus, there is no dispute that T.C. Logging's construction of the road violated the CWA and was not exempted from the CWA's permitting requirements.

V. CONCLUSION

For the foregoing reasons, the Court concludes that there is no genuine issue of material fact to be tried and that T.C. Logging and Henry Clark have filled wetlands without a permit in violation of Section 404 of the Clean Water Act. The Court *GRANTS* plaintiff OCRK's motions for summary judgment on standing and on liability against defendants T.C. Logging, Inc. and Henry Clark. Doc. ## 46, 54. The Court *DENIES* defendants' motion to dismiss for lack of jurisdiction. Doc. # 56.[6]

While this Order disposes of the issue of liability, the Court still must determine the appropriate remedy. On that issue, the Court must conduct a hearing to evaluate the factors set forth in 33 U.S.C. § 1319(d). The Court will await a motion from OCRK for a hearing on this matter.

Finally, OCRK has not filed proof of service with the Court for defendants Low Country Land Clearing, LLC, Low Country Land and Excavating, Inc., RSM Environmental Land Clearing, Inc., and/or Nicholas R. Perkins as required by F.R.Civ.P. 4(l). Within 14 days, OCRK shall provide proof of service or the Court will dismiss the action without prejudice against those defendants. *See* F.R.Civ.P. 4(m).

This 4th day of August 2009.

B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

---

[6] In their response to OCRK's motion for summary judgment, defendants moved the Court for a Rule 56(f) continuance to allow them to conduct additional discovery. Doc. # 49. The Court has waited until the discovery period closed on 5/6/09 and has given defendants ample time to submit their arguments. Defendants' motion for a continuance is therefore *DENIED* as *MOOT*. *Id.*